3w  385
f222  281

## Vernor *against* Henry.

In the case of a latent ambiguity in a will, explanatory declarations made by the testator at the time of the execution of it are admissible in evidence ; so also are previous professions of the testator, indicative of his design to give his property in a particular way.

ERROR to the district court of *Lancaster* county.

This was an action of debt for a legacy of 8000 dollars under the will of Benjamin Vernor deceased, by James Vernor Henry, against the executors of the deceased. That clause of the will upon which the action was founded, was in these words : " I give and bequeath to my nephew James Vernor Henry, son of my deceased sister Eliza-

III.—YY

[Vernor v. Henry.]

beth, his heirs or assigns, the sum or legacy of 8000 dollars, lawful money, to be paid to him one year after my decease."

The plaintiff, to maintain the issue on his part, gave in evidence the will of Benjamin Vernor, and then called John T. Vernor (this witness is one of the executors, and not objected to by defendants, so far as respects his testimony of the pedigree of the family), who deposed: I am a grandson of Benjamin Vernor's brother John. Benjamin Vernor had six brothers and sisters, three brothers and three sisters; of these my grandfather and three sisters were married. His sister Elizabeth married Robert Henry. All I ever knew of the children of Elizabeth Henry were John Vernor Henry and Robert R. Henry. Robert R. Henry is the gentleman here present. John V. Henry is dead. He died in 1829, in the fall of the year. I have heard of other children of Elizabeth Henry, but did not know them personally. I know James Vernor Henry, the plaintiff in this suit. He is the son of John V. Henry, the son of Robert and Elizabeth Henry before mentioned. The plaintiff then put this question to the witness, "Do you know or did you ever hear of any other person of the name of James Vernor Henry?" To which the defendants excepted, but the court overruled the exception, and the defendants excepted to the opinion of the court.

The witness answers the question. No sir, I never heard of any other James Vernor Henry. I shall be thirty-eight years old the 7th of next August. I was born in Washington county, New York, and my family lived there until I was eight years old, when they moved to Albany, and lived there ever since; and I have also lived there ever since, with the exception of two years. I have heard that Robert Henry, who married Elizabeth, was in business. My father had three sisters, who are yet living: Martha, wife of William Hilton; Margaret, the wife, now the widow, of Charles D. Cooper deceased; and Mary, the widow of John Cuyler deceased. Robert Henry, Sen. had a daughter (sister of Robert R. Henry), who is married to William Hallowell. Both husband and wife are living in Montreal. One of the sisters of Benjamin Vernor was married to one Clinch; two of her daughters are living, Benjamin Vernor Clinch and Elizabeth the widow of Mr Clinton. I don't know his first name. Mrs Clinch's name was Hannah. She had two sons, also both dead some years ago, before the death of Benjamin Vernor. I have understood there was another sister of Benjamin Vernor who was married to Mr Douglass, an officer in the British service. I have not heard whether she had children or not. The plaintiff then offers to prove, "that soon after the death of John V. Henry, in October 1829, J. T. Vernor wrote to B. Vernor, informing him of the death of John Vernor Henry; that John Vernor Henry left eight children by his first wife, the eldest of whom is James Vernor Henry, the plaintiff, and left four or five children by his second wife; and that Benjamin Vernor knew before 1830 that John Vernor Henry had left a large family of children at his death, many of whom were then minors;

and that James Vernor Henry was the eldest of the children of John
Vernor Henry.    That John T. Vernor visited B. Vernor four or five
times after the first visit to him in 1818—the last was in September
1831, the one preceding the last was in August or September 1830.
One visit was in the fall of 1825, and one was between the two visits of
1825 and 1830.    That at the visits in 1825 and the subsequent ones,
B. Vernor inquired particularly, and with kindness, after James
Vernor Henry, and inquired after other relatives of B. Vernor, but
that J. T. Vernor never heard B. Vernor speak of Robert R. Henry.
That John V. Henry always lived in Albany, New York, and its
vicinity, and that James Vernor Henry always lived in the state of
New York;" and to prove by Rachael Miller, " that she lived with
Benjamin Vernor for the twenty-five years preceding his death, at
first as a bound girl, and afterwards for hire as housekeeper;·that
about ten or twelve years ago, James Vernor Henry came to Benja-
min Vernor's with Daniel Moore, Esq. and his wife, and staid the
greater part of a day there, and that about a week or ten days after-
wards James Vernor Henry came there on a visit to Benjamin Ver-
nor in the morning and staid till evening, during both which visits
B. Vernor was very kind to, and friendly with him.    That James
Vernor Henry made several visits to B. Vernor after the above men-
tioned two visits, and visited him again about the beginning of May
1831, and staid all night; that during the last illness of Benjamin
Vernor in November 1831, James Vernor Henry came there on Wed-
nesday, and was there every day but one till his death on the Tues-
day following, during which time James Vernor Henry was a great
part of the time in the room with B. Vernor; and conversed with him
and prayed with him; and that during the last as well as the former
visits, the constant behaviour and conversation of B. Vernor towards
James Vernor Henry was kind and friendly, and that the witness
often heard B. Vernor speak of James Henry Vernor when he was
absent, during intervals between the visits before mentioned, and
that he always spoke well of him.    That B. Vernor several times
received letters from James Vernor Henry, one of which was about
ten days after his visit in May 1831.    That Robert R. Henry was
at B. Vernor's once about seven or eight years ago—it was after
harvest and he was there part of a day, on which day there was a
meeting of a company of·light horse—it was at the Cross Keys
tavern, to which B. Vernor and Robert R. Henry went.    That when
Robert R. Henry was going away he requested B. Vernor to remem-
ber him, and B. Vernor said he would remember him—and that
Robert R. Henry was scarcely out of sight, when B. Vernor said,
he should never have a cent's worth of any thing in the world be-
longing to him;" and by Sarah Royer, " that her husband Daniel
Royer and family lived on B. Vernor's place from the spring of 1827
till after his death; and that James Vernor Henry, in the spring of
1831, came to Benjamin Vernor's on a visit and staid all night; and
that next day B. Vernor's coloured man, Cyrus Mitchell, took him

[Vernor v. Henry.]

over to the turnpike with B. Vernor's horse, and that James Vernor Henry was at B. Vernor's about a week during the last illness and at the time of the decease, and the funeral of B. Vernor;" and by Cyrus Mitchell, "that he went to live at B. Vernor's in the latter end of March 1831, and that James Vernor Henry, in May of that year, came in the forepart of a day and staid all night, and till after breakfast next day; that at the request of B. Vernor, witness went with James Vernor Henry to the turnpike; James Vernor Henry riding B. Vernor's horse, and witness walking; that after witness returned from the turnpike, B. Vernor asked him what he thought of James Vernor Henry; that B. Vernor said he thought well of him; that he was a nice young man; that James Vernor Henry had been there a year before, or the spring a year before that time; that he was happy to see him, and that he was the flower of the flock;" and by Joel Baker, Esq., "that B. Vernor gave to the witness the management and superintendence of all his affairs, such as collecting money, renewing notes, making settlements with people who had dealings with him, depositing money, overseeing his farm, for about two years before his death; that in the spring of 1831 witness was at B. Vernor's, and B. Vernor told Joel Baker that Mr Henry, a clergyman, a nephew of his, had been with him all night, and had just gone away, and that Cyrus had just taken him to the turnpike; that B. Vernor said he was sorry that Joel Baker had not seen him; that he knew that he (Joel Baker) would have been pleased with him, and that he, B. Vernor, was well pleased with him; that afterwards B. Vernor received a letter from James Vernor Henry, which letter Joel Baker read to B. Vernor, and B. Vernor asked Joel Baker to write an answer to it for him; that the want of ink or paper, or something of that kind, prevented its being done at that time, and it was put off from time to time and was not done; that Joel Baker lived about two miles from B. Vernor, and for two years before his death he was very often at his house, sometimes every day, sometimes once a week; that James Vernor Henry was at B. Vernor's during the latter part of his last illness, and till after his funeral, about a week in all; that he was with B. Vernor in his room and at his bedside, in his illness;" and by Dr Francis S. Burrows and others, "that B. Vernor, from loss of teeth or other cause, had a lisp or thickness in his speech, that rendered his speech in some degree difficult to be understood by one not accustomed to his company and conversation; that Israel Carpenter, who wrote the wills of B. Vernor of February and June 1830, never had any conversation with B. Vernor before February 1830;" and the plaintiff offers the last will and testament of John V. Henry to show that James V. Henry is an executor of said will, and a testamentary guardian of the minor children of John V. Henry, "and a will executed by Benjamin Vernor, dated the 9th of November 1829, also the notes taken by Israel Carpenter, dated the 8th of February 1830, and signed by B. Vernor, from which a will was shortly after written or executed by B. Vernor (which last two papers, the will and the

[Vernor v. Henry.]

notes, defendants do not except to), also the certified copy of the record of the supreme court of the state of New York, of all the papers and records relative to the application of Robert R. Henry for the benefit of the insolvent laws of that state, the application being made the 17th of November 1829, the discharge the 2d of February 1830; also a letter from James Vernor Henry to B. Vernor, dated the 10th of December 1823, and another of same to same, dated the 8th of April 1824; another of same to same, dated the 15th of June 1831, with evidence that the said letters were received by B. Vernor shortly after their respective dates." To the admission of which evidence (excepting the will of the 9th of November 1829, and the notes for a will taken by Israel Carpenter the 8th of February 1830) the defendants object, but the court overruled the objection, and the evidence is given to the jury, excepting the will of John Vernor Henry, which plaintiff withdrew from his offer, and the letter of the 10th of December 1823 also withdrawn; to which opinion of the court the counsel for the defendants excepted.

Defendants' points.

The court are prayed to charge the jury in this cause upon the following points, and to file their charge of record in the same.

1. That the three written wills made by Benjamin Vernor on the 9th of November 1829, the 8th of February and the 5th of June 1830, are in law considered the highest and the best evidence, and the only evidence in law, of the intention of Benjamin Vernor as to the disposal of his estate after his death.

2. That the plaintiff in this cause has shown by evidence, out of or extrinsic to the written will, that he is the son of John V. Henry and Charlotte his wife, formerly Charlotte Seaton: that he is not the son of Benjamin Vernor's deceased sister Elizabeth; and that he is not in law nor in common speech, the nephew, but the grand-nephew of Benjamin Vernor.

3. That the description of the person named in the bequest of the 8000 dollars, failing to apply to the plaintiff in every particular but the christian name, and there being a person claiming this legacy who was in being when the will was made and known to the testator, who answers this description according to its very letter, a latent ambiguity or uncertainty as to the person intended by the testator to take the legacy is presented.

4. That the plaintiff, by parol or extrinsic evidence, cannot alter or destroy a description as to the pedigree of the person intended by it to take like this, so as to apply it to his name when that name does not suit the pedigree in any one particular: that there is no precedent, no case where pedigree so exact and emphatic as that dictated by the testator, Benjamin Vernor, in this bequest, has been altered or destroyed to suit a name not applying to it.

5. That the evidence by parol or word of mouth, which the plaintiff has been allowed by the court to give to dispel or remove the uncertainty as to the person intended to take, must be conclusive,

[Vernor v. Henry.]

and beyond every doubt dispel or remove the ambiguity ; if it affords only a high degree of probability that James V. Henry was the person intended to take, the evidence is not sufficient, the legacy is not the plaintiff's, and he cannot recover in this suit.

6. That there is no precedent, no case where a pedigree so precise and exact as the one before the court has been altered to suit a name: there is no evidence given in this cause by the plaintiff, that the scrivener who drew the will misapprehended Benjamin Vernor when he dictated the bequest of the 8000 dollars; there is no evidence that Benjamin Vernor ever said, at the time of making his will, or before it was made, or after it was made, that he intended to give the plaintiff, James V. Henry, a legacy.

7. That wherever extrinsic evidence has been received to explain or discover the intention of a testator, such evidence has been true to nature in reference to the number of children or their sex, or their relative ages ; or it was direct evidence coming from the lips of the testator declaring his own intention.

8. That in seeking for the intention of a testator out of his will, in order to remove a latent ambiguity, the law calls for the declarations of the testator: all other evidence arising from the situation and estate of the testator, and his connexion with the legatee, is insufficient to make out intention when it differs from the intention declared in the will.

9. That the sole question trying in this cause is simply this : is James V. Henry, the plaintiff, entitled to this legacy ? Is his right to the legacy the highest and the best? That the question as to the right of the claimant, Robert R. Henry, cannot be tried in this suit ; Robert R. Henry being no party to it, and having his own suit depending against the executors of Benjamin Vernor for the 8000 dollars.

10. That if the plaintiff in this suit do not recover, then will arise another and a distinct question in the trial of Robert R. Henry's suit, as to his right to the legacy, in which will be involved the question, whether the legacy of 8000 dollars be not lapsed and lost to both the claimants.

11. That in point of law, so far as regards the claim of the plaintiff in this suit, the legacy as against him and his claim is lapsed.

Answers of the court to the defendants' points.

1. This is true as to the respective times of those wills, and is true of the last will and testament, so far as it is clear of the latent ambiguity, which is acknowledged to exist with respect to the clause in which the legacy in question is bequeathed.

2. This is a correct account of the pedigree and relationship of the plaintiff, as shown by him : except that he has shown by Joel Baker, Esq. that Benjamin Vernor, in speaking of the plaintiff, always called him his nephew ; and Dr Burrows declared, that in speaking to him of his various relations, he spoke of them all as his nephews and nieces.

[Vernor v. Henry.]

3. This is true.

4. If the evidence be such as satisfies the jury that the person bearing the name mentioned in this clause, and who is the plaintiff in this suit, was intended by the testator, the inconsistent description will not prevent his recovery; and I am of opinion that there are cases where descriptions as pregnant and clear as this have been made to yield to the testator's intentions.

5. The evidence must be such as satisfies the minds of the jury as to the intention of the testator.

6. The first part of this proposition I have already answered in reply to the fourth; as to the residue of it, respecting what evidence is before the jury and what is not, I must refer that to the recollections of the jury.

7. The cases show that when extrinsic evidence has been received, it has been such evidence, parol and otherwise, as was calculated to dispel the latent ambiguity, by showing the actual intention of the testator.

8. The law calls for such evidence as is relevant and sufficient to dispel the ambiguity, whether it be the declarations of the testator, or other facts and circumstances pertinent and relevant to the issue.

9. The question trying is, whether the plaintiff is entitled to this legacy? Robert R. Henry is no party to this record, but he is interested in the event of this issue; for if James Vernor Henry is entitled to the legacy in controversy, Robert R. Henry is not entitled to it.

10. This event may and will probably occur should your verdict be for the defendants.

11. This depends upon a question of fact; if the evidence in this case is not sufficient to dispel the latent ambiguity, the legacy is lapsed as to the plaintiff.

*Reigart* and *Norris,* for plaintiff in error, cited, 2 *Vern.* 624; Havard *v.* Davis, 2 *Binn.* 421; 3 *Penns. Rep.* 415; 1 *Roper* 68, 131, 135, 142; 1 *Mad. Chan.* 82; 1 *P. Wms* 137; 3 *Stark.* 1043; 3 *Bac. Ab.* 378; 1 *Rob. on Wills* 12, 19; 3 *Swin.* 891; 1 *Ventr.* 341; 6 *Term Rep.* 671; 1 *Atk.* 410; Campbell *v.* M'Clenachan, 6 *Serg. & Rawle* 171; 3 *Stark.* 1022; 3 *Bro. Chan.* 446.

*Montgomery* and *Ellmaker,* for defendants in error, whom the court declined to hear.

The opinion of the Court was delivered by

GIBSON, C. J.—There may possibly be a speck of error in the twelve exceptions to evidence, but my eye is not sufficiently microscopic to discern it. Nothing could raise a doubt of the competency of any part of the proof, were it not that evidence was allowed of acts done and expressions used by the testator before and after

[Vernor v. Henry.]

the date of the will.    In the case of a latent ambiguity it is certain that explanatory declarations made at the time of execution are admissible, having been so ruled in Harris *v.* The Bishop of Lincoln, 2 *P. Wms* 137; and Thomas *v.* Thomas, 6 *T. R.* 671.    In the latter, however, previous professions indicative of a design to give the property in a particular way, were excluded.    Though I can see no good ground for it, naked declarations of such a design might possibly be deemed incompetent, for the reason that the important consideration is the state of the intention at the making of the will, when all previous designs may have been abandoned; yet the objection would seem to be rather to the effect of the evidence than its competency, for the admitted existence of a testamentary purpose raises a presumption, however slight, of the continuance of it till rebutted by proof of misconduct, or other circumstance to induce a presumption of a change of feeling towards the person previously intended to be favoured.    But what would be the effect of such a presumption when *strengthened* by circumstances?    In order to show the correspondence of the party's relations and condition to the description by which he claims, to be accidental, would it not be open to proof from the other side, that the testator was a stranger to him, while he had treated the claimant who bears the name as the proclaimed successor to his estate?    No argument built on a subtlety *could* oppose a conclusion so rational.    What, then, is the case which the plaintiff was permitted to prove?    It is in substance, that the testator knew, but did not esteem the person whose pretensions rest upon the efficacy of the description; and that he had avowed a determination to give him nothing: on the other hand that he knew, esteemed, and praised as the most worthy of the family, him whose pretensions are founded on the name; that he received letters from him when absent, made him welcome when present, and received at his hands the care and attentions of a favourite relative in his last moments. From this it will be seen that the difference between the case put for illustration, and the one proposed to be proved, is not in the principle of the evidence, but in the degree of its force.    Were it necessary, it might be remarked that no declaration of a purpose to give the plaintiff a legacy was comprised in the offer; but we hold that to be immaterial.

In relation to the charge, it may be proper to inquire how much of the matter put to the court was irrelevant, or exclusively for the determination of the jury.    The ascertainment of intention from the will itself, falls within the province of the court; and where the sense is incomplete, the deficiency cannot be supplied by extrinsic evidence: a flatent ambiguity occurs, and the bequest is void.    But a discrepance, or an accordance, between the whole or particular parts of the description, may be shown by evidence *dehors*, to create, or to destroy an ambiguity which is said to be latent, because it is concealed by the will, and disclosed but by extrinsic circumstances.    A legatee is designated by *name;* or by *description* according to his condition or

the relation he bears to persons or things; or by both. Where the designation is by a name common to two or more, and without reference to circumstances of description, the question of identity is one purely of fact. Where, however, a description or an addition is inapplicable not only to the party named, but to every one else, its falsity is insufficient to invalidate the designation by the name, the maxim being that *veritas nominis tollit errorem demonstrationis;* and Lord Bacon has some curious observations on this head to show, that next to the actual presence of the donee, a designation of him by name is the more worthy in certainty; whence a legal presumption of fact, in case of a discrepance, that the falsity is in the description, and not in the name. *Bacon's Maxims, Regula XXV.* On this principle was decided Standen *v.* Standen, 2 *Ves. Jun.* 589, and Dare *v.* Geary, cited *Amb.* 375, in which the rule was held as it has just been stated. Where, however, the designation is in part by a name exclusively applicable to one person, and in part by a description exclusively applicable to another, so as to make it uncertain which of the two was meant, the bequest is void; and this was the principal point decided in Thomas *v.* Thomas already quoted: but it was also held, that if it were shown that the testator had *mistaken* the name, the party answering the description might take by force of it; and the converse of the proposition necessarily holds in regard to a mistake of the description. What then was the case before the jury? "I give and bequeath," said the testator, "to my nephew, James Vernor Henry, *son of my deceased sister Elizabeth,* his heirs or assigns, the sum or legacy of 8000 dollars, lawful money; to be paid to him one year after my decease." The plaintiff, though bearing the name James Vernor Henry, is not the nephew, but the grand-nephew of the testator, and not the son, but the grandson of the sister named Elizabeth; and hence a discrepance between the description and his circumstances of relation. On the other hand, Robert R. Henry, who makes pretension, is in fact a nephew of the testator, as well as a son of his sister Elizabeth, and the only person who was so at the making of the will; but though his circumstances of relation correspond to the descriptive part of the designation, he does not answer to the name. This state of the case, unaffected by evidence of misapprehension or mistake, would leave the bequest to sink into the residuum: but to show that the testator misconceived the circumstances of the description, is to destroy its effect as pertaining to any particular person, and thus to bring the case within the principle of Standen *v.* Standen, and Dare *v.* Geary. It is necessarily indifferent to the validity of the bequest whether the misconception relates to the name or the description, since the uncertainty arising from equality of designation is removed by destroying the equipoise which created it; so that, on the principle just indicated, the party designated by the true name or the true description, will take in exclusion of the other, as the fact may turn out. Now whether the testator were not mistaken in imagining that the terms of description corres-

III.—ZZ

[Vernor v. Henry.]

ponded exactly to the relation which the plaintiff actually bore to him and his sister Elizabeth, was a fact put to the jury as the turning point of the cause; and properly so, unless there was no evidence to raise the question: but it was distinctly in proof that he had once had a nephew named John Vernor Henry, who was the son of his sister Elizabeth; that he was apprised of the death of this nephew before the making of the will; that the plaintiff is the son of this nephew, and the head of his family; that the testator had frequently inquired after the plaintiff, and never after Robert R. Henry, his competitor, who claims by the description; that the plaintiff often wrote letters to, and visited the testator, who received him with affection, and spoke of him as being "the flower of the flock;" that Robert R. Henry visited him but once and was coldly received, the testator declaring immediately after his departure, "that he should never have a cent's worth of any thing in the world belonging to him;" and that the plaintiff attended the testator in his last illness, ministering to his temporal and spiritual comforts till his death. Now though many of these matters were subsequent to the will, yet a long and uninterrupted interchange of affection on the one hand, and a coldness amounting almost to disdain on the other, might be fairly left to the jury to rebut a presumption of title founded on a description by reference to circumstances. Every thing else required of the court by way of direction, if compounded of matter of law, was wide of the inquiry; or else it was matter of fact, which is not a subject of revision here. The cause, then, having been put on its true point, and none but competent evidence having been introduced, the defendants have failed in all their assignments of error.

Judgment affirmed.